DANIEL W. ISAACS, ESQ. (DI-5179)
**LAW OFFICES OF DANIEL W. ISAACS, PLLC**
122 Cross River Road
Mount Kisco, New York 10549
Tel:(646) 438-2100
E-mail: daniel.isaacs@danwisaacsesq.com

PETER J. GLEASON, ESQ. (PJ-7106)
**PETER J. GLEASON, P.C.**
935 South Lake Boulevard
Suite 17
Mahopac, New York 10541
Tel: (646) 872-3546
E-mail: pjgleason@aol.com

Attorneys for Plaintiff, AARON ROSS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x
AARON ROSS,                                          Case No.


                        Plaintiff,        **COMPLAINT**

            - against -

UNIVERSAL HEALTH SERVICES, INC., PROVO
CANYON SCHOOL, JUSTIN UALE, WENDY
TURNBOW and LORNA HALL,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - x

    Plaintiff, Aaron Ross, by his attorneys, The Law Offices of

Daniel W. Isaacs, PLLC, and Peter J. Gleason, P.C., complaining

of the defendants, Universal Health Services, Inc., Provo Canyon

School, Justin Uale, Wendy Turnbow and Lorna Hall, alleges as

follows:

e

## NATURE OF THE ACTION

1.   This action arises from the continuous and unrelenting physical, emotional and psychological torture, sexual abuse, forced seclusion and drug-induced sedation endured by the plaintiff, Aaron Ross, while a student at the Provo Canyon School between May of 2001 and April of 2003.

2.   School administrators and staff, acting under color of state law, caused the Plaintiff to suffer and be subjected to, *inter alia*, cruel and unusual punishment, antitherapeutic and inhumane treatment, denial of due process of law and violation of his right to free speech.

3.   As set forth below, Defendants' conduct violated Plaintiff's rights guaranteed under the First and Fourteenth Amendments to the United States Constitution and constituted assault, battery, false imprisonment, intentional infliction of emotional distress, loss of parental consortium, negligence and civil conspiracy in violation of New York State Law.

4.   That as a direct result of Defendants' violation of Plaintiff's constitutional rights and their unlawful conduct he was caused to suffer serious damage and injury including, *inter alia*, monetary damages, physical and psychological injury and trauma, extreme emotional distress and, post-traumatic stress disorder.

e

5.    This action is therefore brought pursuant to the New York Child Victims Act 2019 Sess. Law News of N.Y. Ch. 11 (S. 2440), CPLR 214-G, and 22 CRR 202.72 seeking damages pursuant to 42 U.S.C. Section 1983 to redress the violation of Plaintiff's constitutional rights to freedom of speech under the First Amendment and due process under the Fourteenth Amendments to the United States Constitution.  Plaintiff also asserts derivative causes of action for assault, battery, false imprisonment, intentional infliction of emotional distress, loss of parental consortium, negligence and civil conspiracy pursuant to New York State Law.

## JURISDICTION

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 (federal question jurisdiction) and 1343(a) (civil rights jurisdiction) because this action is filed to obtain relief for the deprivation of the rights of a citizen of the United States secured by the United States Constitution and federal law pursuant to 42 U.S.C. Section 1983.

## VENUE

7.    As Plaintiff is a resident of the County of Kings, City and State of New York, venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(1).

e

-3-

## THE PARTIES

8.   That at all times hereinafter mentioned the plaintiff, Aaron Ross ("Ross"), is a resident of the County of Kings, City and State of New York and was so at the time of the sexual and other abuse alleged herein.  Ross is a male, born on October 28, 1987, and was a minor during the entire time of the sexual misconduct alleged herein.

9.   That defendant Universal Health Services, Inc. ("Universal"), located in King of Prussia, Pennsylvania, is one of the United States' largest provider of hospital and healthcare services operating, *inter alia*, 334 behavioral health inpatient and 39 outpatient facilities, with $11.37 billion in annual revenue in 2019.

10.   That defendant Provo Canyon School ("Provo") is an intensive psychiatric youth residential treatment facility located in the State of Utah that was founded in 1971.

11.   That in August of 2000 defendant Universal purchased defendant Provo.

12.   That at all times hereinafter mentioned defendant Universal operated defendant Provo.

13.   That at all times hereinafter mentioned defendant Universal managed defendant Provo.

14.   That at all times hereinafter mentioned defendant Universal maintained defendant Provo.

e

15.   That at all times hereinafter mentioned defendant Universal controlled defendant Provo.

16.   That at all times hereinafter mentioned defendant Justin Uale ("Uale") was and is an adult male individual.  During the period of time in which the childhood sexual harassment and abuse of Plaintiff Aaron Ross, as alleged herein, took place, Uale was a staff member and/or counselor who supervised the day and on occasion night shift and was employed by both Universal and Provo. That at all times hereinafter mentioned Uale was an employee, agent and/or servant of defendants Universal and Provo and was under their complete control and/or active supervision.

17.   That at all times hereinafter mentioned the defendant Wendy Turnbow ("Turnbow"), was plaintiff Aaron Ross' therapist at Provo and was employed by both Universal and Provo.  That at all times hereinafter mentioned Turnbow was an employee, agent and/or servant of defendants Universal and Provo and was under their complete control and/or active supervision.

18.   That at all times hereinafter mentioned the defendant Lorna Hall ("Hall"), was a supervising staff member and employed by both Universal and Provo.  That at all times hereinafter mentioned Hall was an employee, agent and/or servant of defendants Universal and Provo and was under their complete control and/or active supervision.

e

## BACKGROUND

*"Troubled Teen" Industry*

19.   Every year thousands of children from every state in the Union are sent against their will - often handcuffed in the middle of the night by armed strangers (known as "Transporters") - to private facilities to purportedly be treated for behavioral problems, mental illness and addiction issues.

20.   Due to inconsistencies in the definition of what a therapeutic boarding school is and a lack of regulatory oversight, the exact numbers of student/residents and centers are not known but it is estimated that there are over 50,000 children kept in approximately 1,500 treatment centers around the United States, collectively known as the "Troubled Teen Industry."

21.   Labeled as "boot camps," "behavior modification facilities," "wilderness therapy" and "gay conversion therapy," and selling themselves to parents, therapists and state and judicial agencies as providing therapeutic treatment, these programs instead dispense a myriad of maltreatment including physical, verbal and sexual abuse, chemical sedation and isolation, vigorous labor, the use of physical restraints, food and sleep deprivation and humiliation, amongst others, some of which the Geneva Convention banned as being too extreme for prisoners of war.

e

22.   This abuse is compounded by their function as "total institutions," whereby the students live under the singular administrative authority of the school, have limited contact with the outside world and are not routinely allowed to leave school property, residing there from several weeks to several years.

23.   This institutional life is constructed around strict schedules, extensive rules and the reward/withholding of privileges.  Students are constantly under surveillance by staff as well as fellow students, all of whom are required to report any breach of the rules, facing punishment themselves for failing to do so.  Rules and regulations can be so extensive that it may be difficult to avoid breaking them, especially as some rules can be arbitrary and inconsistently applied depending on interpersonal staff-student dynamics.

24.   The origins of the Troubled Teen Industry can be traced back decades, to an organization called Synanon that ostensibly started as a substance abuse program in 1958.  It was founded by a former alcoholic, Charles Dederich, who claimed to be inspired by Alcoholics Anonymous and wanted to treat addicts.

25.   Dederich allegedly coined the maxim, "Today is the first day of the rest of your life," and envisioned Synanon as the start of a new utopian society – and he was soon well on his way, as the group grew popular (some likened it to a cult) and started building their own schools and businesses.

e

26.   But, the program used various problematic tactics, such as humiliation, isolation, sleep deprivation, and manual labor and was discredited in the late 1970s and 1980s as its violent record was exposed.   It is now remembered for an incident in which a member placed a lived rattlesnake – rattle removed – in the mailbox of a lawyer who'd successfully sued it.

27.   By the time it officially shut down, in 1991, its model had already been widely copied, with dozens of lucrative behavioral therapy programs for troubled youth – charging thousands of dollars a month – emanating from its treatment philosophy.

28.   Due to long-standing and ever-increasing concerns regarding abuse and death in certain programs for troubled youth and, following publicity surrounding the book "Help at any Cost: How the Troubled-Teen Industry Cons Parents and Hurts Kids," published in February of 2006, the United States Government Accountability Office ("GAO") issued the first in a series of reports, beginning in October of 2007.   This was followed by a report in April of 2008 addressing selected cases of death, abuse and deceptive marketing at these facilities and a third report in May of 2009 regarding these facilities' use of seclusion and restraints and associated deaths due to, and the abuse of same.

e

*Provo Canyon School*

29.   Utah is the epicenter of the "troubled teen" industry, with nearly 100 youth residential treatment centers, more than any other state, contributing nearly One-Half Billion Dollars a year to its economy.

30.   Considered to be among Utah's "worst of the worst" of these troubled institutions is defendant Provo, one of the State's largest and oldest facilities.  Founded in 1971 in the shadow of Brigham Young University, the premiere educational institution of The Church of Jesus Christ of Latter-day Saints, it currently has approximately 300 male and female residents at two campuses.

31.   Although privately owned and operated, it receives funds from both state governments and the United States.  It was established for the primary purpose of educating teenage boys whose problems were so severe that their treatment and education required a restricted, therapeutic environment.

32.   Operating therefore not only as a school but as a correctional, detention and mental health facility as well, Provo has been accused of abuse since its inception and the subject of a series of individual and class-action lawsuits throughout the 1980s and 1990s.  These lawsuits alleged everything from verbal, physical and sexual abuse to the punitive use of solitary confinement and a tactic called "the hair dance," in which teens

e

were dragged around by their hair, to medical negligence, the violation of student's First Amendment rights and invasion of privacy, to false imprisonment and battery, intentional infliction of emotional distress, civil conspiracy and loss of parental consortium.

33.   In the case of *Milonas v. Williams*, 648 F.2d 688 (10th Cir. 1981), a class action brought against Provo in 1980, the Court found that Provo was a state actor for the purposes of Section 1983 and issued a preliminary injunction that enjoined four "behavior-modification" practices then in effect at the school: (i) opening, reading, monitoring or censoring students' mail; (ii) administering polygraph examinations for any purpose whatsoever; (iii) placing students in isolation facilities for any reason other than to contain a student who was physically violent; and (iv) using physical force for any purpose other than to restrain a juvenile who is either physically violent and immediately dangerous to himself or others, or physically resisting institutional rules.

34.   In 1986 Charter Behavioral Health Systems, Inc. ("Charter"), once the largest operator of psychiatric hospitals and treatment centers in the United States, bought the original Provo Campus.  It operated Provo for the next fourteen years.

35.   In 1999, media personality Paris Hilton spent eleven months as a Provo student when she was seventeen-years old.

e

Around this same time Charter was facing Medicaid fraud allegations - subsequently paying a Seven Million ($7,000,000.00) Dollar fine without admitting guilt - amid media reports of inappropriate treatment and inadequate care at Charter-owned facilities across the country, culminating in its filing for bankruptcy in 2000.

36.   In August of 2000 Charter sold a dozen properties – including Provo – to defendant Universal.

37.   Despite the change in ownership the abuse and mistreatment at Provo continued unabated during the decades that followed, with multiple former students coming forward with stories of, *inter alia*, being overmedicated, restrained and punished for minor infractions.

38.   Utah's Office of Licensing, which regulates the state's youth residential treatment centers, placed Provo's license on "conditional status" in 2012 (after staff did not properly watch students and a boy ran away, subsequently causing a fatal car accident), 2013 (after a girl was injured in a restraint) and 2015 (after staff, on two occasions, injured students while holding them in restraints.  The Provo facility was also in violation for having a seclusion room with a lock on it).

39.   Between 2015 and 2020 Utah's Office of Licensing conducted 341 investigations at Provo's four campuses, substantiating twenty-seven violations.

e

40.   Between January 3, 2012, and September 16, 2019, police responded to Provo's Springville campus 239 times to reports that included 43 assaults, 20 sex offenses, and a sexual assault.

41.   Between May 16, 2012, and August 28, 2019, police responded to Provo's Provo campus 182 times to reports that included 28 assaults, 26 sex offenses, 24 sexual assaults and, 11 abuse of child.

42.   In October of 2020 a public protest was held outside Provo led by Ms. Hilton, who had recently publicized the pervasive physical, emotional and mental abuse she suffered there.

43.   In response, defendant Universal issued a statement that it could not comment on operations and patient experiences before its purchase of Provo.  It further denied using solitary confinement, mechanical restraints, seclusion, isolation and medication as a form of discipline or use for sedation.

44.   The Utah State Legislature subsequently held hearings in February of 2021 regarding increased oversight for facilities like Provo.  Regarding her own experiences Ms. Hilton testified, *inter alia,* that:

> I was verbally, mentally and physically abused on a daily basis. I was cut off from the outside world and stripped of all of my human rights.  I was not allowed to be myself, hold my own opinions or even speak.  Without a diagnosis I was forced to consume medication that made me feel numb and exhausted.  I didn't breathe fresh air or see the sunlight for 11 months.

e

-12-

>Children were restrained, hit, thrown into walls, strangled and sexually abused regularly at Provo. . . . I could not report this because all communication with my family was monitored and censored.
>
>That was the worst of the worst. . . . There's no getting out of there. You're sitting on a chair and staring at a wall all day long, getting yelled at or getting hit.
>
>I didn't know what they were giving me. . . . I would just feel so tired and numb. Some people in that place were just gone. The lights were on, but no one was home.

45. Following these hearings and for the first time in fifteen years, Utah's legislature enacted new laws regarding these facilities, including placing limitations on the use of restraints, drugs and isolation rooms and, increasing the number of required inspections.

46. In sum, Provo has remained "in business" for 50 years despite multiple lawsuits, a company bankruptcy, state threats to pull its license and multiple public accounts of abuse spanning decades from those subjected to its horrors.

47. As set forth below, Plaintiff Aaron Ross' voice is now added to the chorus of sorrow, pain and anguish that gone on for far too long.

## FACTUAL ALLEGATIONS

48. In May of 2001 Plaintiff was thirteen years of age living with his parents in Mill Basin Brooklyn with a history of Asperger's syndrome, a neurodevelopment disability that affects the ability to effectively interact and communicate with people.

e

-13-

Due to a history of domestic behavioral problems centered around his refusal to go to school due to bullying, his parents sought the advice of The Goldberg Center, a consulting organization that claimed to specialize "in helping children, teens, and young adults who need to find an appropriate setting in order to have their needs met."

49.   Without interviewing plaintiff, The Goldberg Center's founder and president, Leslie S. Goldberg, referred Provo to Plaintiff's parents and in the early morning hours of May 22, 2001, he was removed from his home without warning in handcuffs by three armed guards.

50.   Upon information and belief the Goldberg Center received Ten Thousand ($10,000.00) Dollars from Provo for referring the plaintiff to its facility, paying in essence a bounty.

51.   Plaintiff was taken to JFK airport and flown to Salt Lake City Utah accompanied by two escorts and then transported to Provo's Orem Campus.  It would be the last time Aaron Ross would breathe fresh air or feel the sun on his skin for nearly two years.

52.   Upon his arrival Plaintiff was strip searched and forced to wear a hospital gown.  He was kept isolated for several days and seen by a psychiatrist for no more than two minutes

e

before being placed on a daily cocktail of drugs without receiving a diagnosis or written plan of treatment.

53. These medications, which caused Plaintiff to remain in a state of constant sedation, included Seroquel (ultimately administered at nearly three times the maximum daily dose), Depkotl, Trileptal and Celexa. Plaintiff was also subjected to multiple forcible injections of Haldol, referred to as "booty juice" by the staff and students, during which he was physically tied down to a mattress.

54. During the course of his twenty-three months at Provo, the final four months of which were at the Provo campus, Plaintiff was subjected to undue punishment if not outright brutality in no way related to the school's educational program. This included:

* Being subjected to verbal, mental and physical abuse on a daily basis

* Being disciplined for not folding laundry properly, improperly making his bed, not standing properly in line, talking, looking around, or taking too long in the shower

* Prolonged food and sleep deprivation for days at a time

* Spending days or weeks in a row sitting at a desk facing the wall except for bathroom breaks and sleeping

* Having his mail monitored, censored and destroyed

* Having his phone calls monitored by Turnbow so he could not have a private conversation with his parents, who would interrupt or abruptly end their talk if she disagreed with anything he said

e

\* Spending nearly two years locked indoors without being let outside to breathe fresh air or feel the sunlight

55.   Due to the combined effects of the medications he was forced to ingest daily, plaintiff would be penalized by moving around even when directed not to so as to avoid falling asleep at his desk or not completing academic assignments, incurring additional penalties.

56.   Due to these continued infractions Plaintiff would be placed for days and sometimes weeks at a time in what was known as the "observation room," a small bare windowless cement room bereft of any furniture or carpeting for the floor.  He would only be allowed out to use the bathroom and at times slept on a mattress that was brought to the room for his use overnight.

57.   It was during the overnight shift of these confinements, which occurred nearly a dozen times, that Plaintiff was forced to undress at the direction of the defendant, Uale, who was the shift supervisor.

58.   Uale would then pull his pants down, sit in a chair that he brought into the room and direct Plaintiff to give him oral sex.  Although most of the times Uale would ejaculate onto Plaintiff's hands he also ejaculated into his mouth, forcing Plaintiff to spit out his seamen and pubic hairs.

59.   If Plaintiff resisted defendant Uale's orders he would be deprived by Uale of food and forced to stay awake all night until he submitted to his depraved demands.

e

60.   Such conduct was done for Uale's sexual gratification and was performed by Plaintiff under duress and without his free consent, as Plaintiff was a mere minor and thus unable to give valid, legal consent to such sexual acts, which were criminal in nature.

61.   As a student at Provo, where Uale was employed and worked, Plaintiff was under Uale's direct supervision, care and control, thus creating a special relationship, fiduciary relationship, and/or special care relationship with defendants Universal and Provo.  Moreover, as a minor child under the custody, care and control of defendants Universal and Provo, said Defendants stood *in loco parentis* with respect to Plaintiff while he was residing at Provo.  As the responsible parties and/or employers controlling Uale, Defendants were also in a special relationship with Plaintiff, and owed special duties to Plaintiff.

62.   Plaintiff complained to his therapist, Turnbow, about Uale's abuse, who called him a "liar," told him to "shut up" and wrote him up for punitive infractions for even bringing it up.

63.   Plaintiff also complained to a supervisor, the defendant, Hall, who also ignored his complaints.

64.   Plaintiff was finally released from Provo on April 23, 2003, and returned home to Brooklyn, New York, where he began to experience multiple mental, emotional and psychological problems

e

-17-

due to the sexual and physical abuse he endured and which he had not previously suffered from prior to being placed at Provo.

65.    Plaintiff was subsequently diagnosed with Post Traumatic Stress Disorder and hospitalized at Bellevue Hospital Center for six months due to the trauma and extreme emotional distress he suffered.

66.    That by reason of Defendants' tortious acts, omissions, wrongful conduct and/or breach of their duties, whether willful or negligent, Plaintiff's employment and personal development was and will continue to be adversely affected.  Plaintiff has lost and will continue to lose wages as a result of the abuse he suffered at the hands of Defendants, in an amount to be determined at trial.  Plaintiff has suffered economic injury, all to Plaintiff's general, special and consequential damage in an amount to be proven at trial, but in no event less than the minimum jurisdictional amount of this Court.

67.    As set forth herein Defendants Universal and Provo failed to uphold numerous mandatory duties imposed upon them by state and federal law, and by written policies and procedures applicable to them including, *inter alia*, a duty to enact policies and procedures that were not in contravention of the Federal Civil Rights Act, section 1983, the 1st and the 14th Amendments of the United States Constitution.

e

68.   Compulsory education laws create a special relationship between students and Defendants Universal and Provo, and students have a constitutional guarantee to a safe, secure and peaceful school environment.   Defendants Universal and Provo failed to acknowledge unsafe conditions, and therefore failed to guarantee safe surroundings in an environment in which Plaintiff was not free to leave, specifically including but not limited to allowing Uale to take Plaintiff for purposes of sexual activity and allowing Uale to operate isolated environments, incapable of monitoring from the outside, wherein Vale sexually harassed and abused Plaintiff.

69.   Defendants Universal and Provo had and have a duty to protect students, including Plaintiff.   Said Defendants were required, and failed, to provide adequate campus supervision, and failed to be properly vigilant in seeing that supervision was sufficient to ensure the safety of Plaintiff.

70.   Defendants Universal and Provo lodged with Uale the color of authority, by which he was able to influence, direct and abuse Plaintiff, and to act illegally, unreasonably and without respect for the person and safety of Plaintiff.

71.   Defendants Universal and Provo had a duty to and failed to adequately train and supervise all advisors, teachers, mentors and staff to create a positive, safe, spiritual and educational environment, specifically including training to perceive, report

e

-19-

and stop inappropriate conduct by other members of the staff, specifically including Uale, with children.

72.    In subjecting Plaintiff to the wrongful treatment herein described, Uale acted willfully and maliciously with the intent to harm Plaintiff, and in conscious disregard of Plaintiff's rights, so as to constitute malice and/or oppression. Plaintiff is therefore entitled to the recovery of punitive damages.

## AS AND FOR A FIRST CAUSE OF ACTION FOR THE VIOLATION OF 42 U.S.C. SECTION 1983

73.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "72" of this complaint with the same force and effect as if set forth at length herein.

74.    That as a result of the illegal and improper acts set forth above, all of which were done intentionally and with deliberate and undue callous disregard of Plaintiff's rights, Ross was deprived of his Constitutional Rights secured under the 1st and 14th Amendments of The Constitution of the United States and 42 U.S.C. Section 1983.

75.    Ross was deprived of a protected liberty interest without due process of law due to, *inter alia*, the deprivation of his life and liberty.

76.    Defendants intended to violate Ross' constitutional rights, knew their actions were arbitrary, capricious, violated
e

the Plaintiff's rights and/or acted with reckless disregard for whether their actions violated Ross' rights and, were otherwise illegal.

77.   Ross has suffered, continues to suffer and will in the future suffer economic loss due to Defendants' impermissible conduct.

78.   Ross has suffered, continues to suffer and will in the future suffer emotional distress and damage due to Defendants' impermissible conduct.

79.   Pursuant to 42 U.S.C. Section 1983 Defendants, in their individual capacity are jointly and severally liable to the Plaintiff for the financial losses he has and will suffer as well as compensatory damages for the emotional harm Ross has suffered.

80.   Since Defendants acted intentionally and in a wanton and reckless disregard of Ross' constitutional rights, he is entitled to punitive damages against Defendants jointly and severally.

81.   Ross is entitled to reasonable attorneys' fees, costs and disbursements incurred in the prosecution of this action.

82.   **WHEREFORE,** Plaintiff prays for judgment as set forth below.

e

## AS AND FOR A SECOND CAUSE OF ACTION FOR
## ASSAULT
## (AGAINST ALL DEFENDANTS)

83.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "82" of this complaint with the same force and effect as if set forth at length herein.

84.   That as set forth above Defendants made unwarranted threats of violence against the Plaintiff.

85.   These threats were made with the intent to provoke observation of the threat.

86.   These threats caused a reasonable observation of immediate danger and imminent harm.

87.   That Defendants had the capacity to bring about the violence at the time of the treats made and/or Plaintiff reasonably believed that they were actually capable of doing so.

88.   That a reasonable person in Plaintiff's circumstances would have been apprehensive.

89.   That there exists a causal connection between Defendants' unlawful conduct and Ross' emotional distress.

90.   **WHEREFORE,** Plaintiff prays for judgment as set forth below.

e

## AS AND FOR A THIRD CAUSE OF ACTION FOR
### BATTERY
### (AGAINST ALL DEFENDANTS)

91.  Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "90" of this complaint with the same force and effect as if set forth at length herein.

92.  That as set forth above Plaintiff was touched in an offensive manner and was aware of the contact at the time it actually occurred.

93.  That Plaintiff was battered by both contact that caused physical harm and nonconsensual contact that did not cause physical harm.

94.  That the contacts set forth above and Defendants' conduct in furtherance of same was intentional and not an accident.

95.  That there exists a causal connection between Defendants' unlawful conduct and Klein's emotional distress.

96.  **WHEREFORE,** Plaintiff prays for judgment as set forth below.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
### FALSE IMPRISONMENT
### (AGAINST ALL DEFENDANTS)

97.  Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "96" of this

e

complaint with the same force and effect as if set forth at length herein.

98.   That as set forth above Defendants intended to confine Plaintiff.

99.   That Plaintiff was conscious of the confinement.

100.   That Plaintiff did not consent to the confinement.

101.   That the confinement was not otherwise privileged.

102.   That there exists a causal connection between Defendants' unlawful conduct and Ross' emotional distress.

103.   **WHEREFORE**, Plaintiff prays for judgment as set forth below.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST ALL DEFENDANTS)

104.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "103" of this complaint with the same force and effect as if set forth at length herein.

105.   The Defendants' deliberate and malicious indifference to their obligations as set forth above was extreme, outrageous and beyond the reasonable bounds of decency tolerated by decent society.

106.   That Defendants intended to cause and/or disregarded a substantial probability of causing severe emotional distress and, because of the reprehensible and e

-24-

outrageous nature of their acts, Ross is entitled to, and should be awarded, punitive damages against each of the Defendants.

107. That there exists a causal connection between Defendants' unlawful conduct and Ross' emotional distress and damage.

108. **WHEREFORE**, Plaintiff prays for judgment as set forth below.

### AS AND FOR A SIXTH CAUSE OF ACTION FOR LOSS OF PARENTAL CONSORTIUM (AGAINST ALL DEFENDANTS)

109. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "108" of this Complaint with the same force and effect as if set forth at length herein.

110. That due to Defendants' conduct as set forth above Plaintiff was deprived of the love, affection and guidance of his parents.

111. That there exists a causal connection between Defendants' unlawful conduct and Ross' emotional distress.

112. **WHEREFORE**, Plaintiff prays for judgment as set forth below.

### AS AND FOR A SEVENTH CAUSE OF ACTION FOR NEGLIGENCE (AGAINST ALL DEFENDANTS)

e

113.   Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "112" of this Complaint with the same force and effect as if set forth at length herein.

114.   That defendants Universal and Provo negligently hired and/or retained defendant employee Uale with knowledge of his propensity for the type of behavior that resulted in Plaintiff's injuries in this action.

115.   That defendants Universal and Provo negligently placed the defendant Uale in a position to cause foreseeable harm, which most probably would not have occurred had defendants Universal and Provo taken reasonable care in the hiring of employees.

116.   That defendants Universal and Provo negligently hired and/or retained defendant Uale, negligently placed defendant employee Uale in a position to cause foreseeable harm, which Plaintiff would not have been subjected to had defendants Universal and Provo taken reasonable care in supervising or retaining the defendant, Uale.

117.   That defendants Universal and Provo knew or should have known of defendant Uale's propensity for the conduct that caused Plaintiff's injuries.

118.   That defendants Universal and Provo negligently

e

failed to properly train and/or supervise the defendant, Uale.

119.   That as a result of the foregoing Plaintiff was seriously and permanently injured.

120.   That said occurrence and the resulting injuries to Plaintiff were caused solely and wholly by reason of the negligence and careless of defendants Universal and Provo in the operation, management, maintenance, control, security and supervision of Provo and employees within Provo.

121.   That as a result of the foregoing, Plaintiff was injured solely and wholly as a result of the negligence, carelessness and recklessness of the defendants Universal, Provo and Uale and/or each of them, without any negligence on the part of the Plaintiff contributing thereto.

122.   That upon information and belief prior to the first incident of Uale's sexual harassment and abuse of Plaintiff, Defendants Universal and Provo knew or should have reasonably known that Uale had or was capable of sexually and/or mentally abusing the Plaintiff.

123.   Defendants Universal and Provo had special duties to protect the minor Plaintiff, who was entrusted to their care by his parents.  Plaintiff's care, welfare and/or physical custody was entrusted to Defendants Universal and Provo.  Said Defendants voluntarily accepted the entrusted care of Plaintiff.  As such

e

Defendants owed Plaintiff, a minor child, a special duty of care, in addition to a duty of ordinary care, and owed Plaintiff the higher duty of care that adults dealing with children owe to protect them from harm.

124.   That upon information and belief Defendants Universal and Provo breached their duties of care to the minor Plaintiff by allowing Uale to come into contact with the minor Plaintiff, without supervision; by failing to adequately hire, supervise and/or retain Uale, who they permitted and enabled to have access to Plaintiff; by failing to investigate or otherwise confirm or deny such facts about Uale; by failing to tell or concealing from Plaintiff, his parents, guardians and law enforcement officials that Uale was or may have been sexually harassing and abusing minors; by failing to tell or concealing from Plaintiff's parents That as set forth above Defendants engaged in multiple over acts in furtherance of their unlawful agreement.

125.   That due to Defendants' conduct as set forth above Plaintiff was deprived of the love, affection and guidance of his parents.

126.   That there exists a causal connection between Defendants' unlawful conduct and Ross' emotional distress.

127.   That as a result of the foregoing, Plaintiff was injured solely and wholly as a result of the negligence, carelessness and recklessness of the defendants Universal, Provo

e

and Uale and/or each of them, without any negligence on the part
of the Plaintiff contributing thereto.

128. **WHEREFORE**, Plaintiff prays for judgment as set forth
below.

### AS AND FOR A EIGHTH CAUSE OF ACTION FOR CIVIL CONSPIRACY (AGAINST ALL DEFENDANTS)

129. Plaintiff repeats, reiterates and realleges each and
every allegation set forth in paragraphs "1" through "128" of
this Complaint with the same force and effect as if set forth at
length herein.

130. That Plaintiff has alleged the cognizable torts set
forth above.

131. That there was an agreement between the Defendants
regarding these torts.

132. That as set forth above Defendants engaged in multiple
overt acts in furtherance of their unlawful agreement.

133. That due to Defendants' conduct as set forth above
Plaintiff was deprived of the love, affection and guidance of his
parents.

134. That there exists a causal connection between
Defendants' unlawful conduct and Ross' emotional distress.

e

135.  **WHEREFORE,** Plaintiff prays for judgment as set forth below.

### PRAYER FOR RELIEF

**On the First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Claims for Relief:**

1. For general damages according to proof at trial;

2. Punitive damages in an amount to be proven at trial;

3. Declaratory and Injunctive relief;

4. Attorneys' fees, costs and disbursements of this action;

5. For such other legal and equitable relief as the Court may deem Plaintiff is entitled to receive.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure Plaintiff demands a trial by jury in this action.

Dated:  Mount Kisco, New York
        August 6, 2021

                    Yours, etc.

                    **LAW OFFICES OF DANIEL W. ISAACS, PLLC**

                    By: _____
                    DANIEL W. ISAACS, ESQ.
                    Attorneys for Plaintiff

                    **PETER J. GLEASON, P.C.**

                    By: _____
                    PETER J. GLEASON, ESQ.
                    Attorneys for Plaintiff

e